**TRANS–ASIATIC OIL LIMITED, S.A., Plaintiff,**

v.

**APEX OIL COMPANY, Defendant,**

**Puerto Rico Electric Power Authority, Garnishee.**

**Civ. No. 83–339 GG.**

United States District Court, D. Puerto Rico.

Oct. 20, 1983.

Francisco G. Bruno, Santiago, Pérez, Bermúdez & Bruno, Hato Rey, P.R., for plaintiff.

Pedro J. Santa-Sánchez, O'Neill & Borges, Hato Rey, P.R., for defendant.

## OPINION AND ORDER

GIERBOLINI, District Judge.

This is an action to recover a series of demurrage charges which plaintiff, Trans-Asiatic Oil Limited, S.A. (Trans-Asiatic) claims are due and owing to it by defendant, Apex Oil Company (Apex). Jurisdiction is alleged under Title 28, United States Code, Section 1333.

Plaintiff is a Panamanian corporation with its principal place of business in Israel. Defendant is a foreign corporation with its principal place of business in Missouri.

The pertinent facts may be briefly summarized as follows:

Plaintiff, Trans-Asiatic is a vessel owner who apparently chartered several vessels to Apex. As a result of that relationship, plaintiff avers that it has a series of claims against Apex for demurrage incurred during certain voyages performed by plaintiff's vessels on behalf of Apex. A verified complaint was filed by plaintiff to recover these debts from defendant. Since defendant could not be found within this district, Trans-Asiatic served a process of maritime attachment and garnishment upon Puerto Rico Electric Power Authority (PREPA) on March 2, 1983, pursuant to Rule B(1) of the Supplemental Rules for Certain Admiralty and Maritime Claims. Through said service of process, credits or monies owed by PREPA to defendant amounting to $324,083.26 were attached.

Defendant has requested that the process of maritime attachment and garnishment be vacated on the grounds that plaintiff failed to comply with Rule 19 of the Rules of the United States District Court for the District of Puerto Rico; that the process of maritime attachment and garnishment is null and void under the Constitution of the United States; and that a substantial portion of plaintiff's monetary claims against Apex cannot, as a matter of law, be the object of the garnishment effected.

I

Rule 19 provides in its pertinent part as follows:

*Rule 19: Security for Costs*

A. No complaint in an action in personam with process of maritime attachment or garnishment, as provided for in Rule B of the Supplementals of the Federal Rules of Civil Procedure, as well as an action provided for in Rule D of said Supplementals, shall be filed, except on

the part of the United States or on the special order of the Court, unless the party offering the same shall file a stipulation in the minimum sum of $250.00 for costs, conditioned that the principal shall pay all costs awarded by the Court and, in case of appeal, by an appellate court, against him, it or them. In lieu of a stipulation, the party may deposit the minimum of $250.00 for costs in the registry of the Court, without requiring permission or an Order of the Court.

■ Plaintiff did not file the stipulation required by this rule with the verified complaint. However, on April 13, 1983 the sum of $250.00 for costs, contemplated in the aforementioned rule, was deposited by Trans-Asiatic with the registry of this court. Thus, the requisites of Rule 19 have been fully complied with and this issue is moot.

## II

The principal issue here is whether the process of maritime attachment and garnishment, provided in Rule B(1) of the Supplemental Rules for Certain Admiralty and Maritime Claims, is constitutionally valid. Defendant contends that Rule B(1) violates the due process clause of the Fifth Amendment because it permits this court to exercise jurisdiction despite the absence of sufficient contacts of the defendant with this district based on *Shaffer v. Heitner*, 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977). Apex further contends that Rule B(1) violates the due process clause because it results in the deprivation of property without prior notice and hearing on the basis of *Sniadach v. Family Finance Corporation of Bay View*, 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969), and its progeny.

■ To determine the validity of defendant's arguments, consideration must be given to the special character of admiralty proceedings and the rationale for Supplemental Rule B. Suits under admiralty and maritime jurisdiction are autonomous from common law policies and principles. The Supreme Court held in *Romero v. Interna-*

*tional Term. Operat. Company*, 358 U.S. 354, at 368, 79 S.Ct. 468, at 478, 3 L.Ed.2d 368 (1959) that "[A]ll cases to which 'judicial power' extends 'arise' in a comprehensive, non-jurisdictional sense of the term, 'under this constitution.' It is the Constitution that is the ultimate source of all 'judicial Power'—defines, grants and implies limits—and so 'all Cases of admiralty and maritime jurisdiction arise under the Constitution in the sense that they have constitutional sanction.' But they are not 'Cases, in Law and Equity, arising under this Constitution, the laws of the United States ...'".

The autonomy of admiralty and maritime law from common law principles has been consistently recognized in more recent decisions. *See Amoco Overseas Oil Co. v. Compagnie Nationale Algerienne de Navigation*, 605 F.2d 648 (2nd Cir.1979) and *Grand Bahama Petroleum Co., Ltd. v. Canadian Transportation Agencies, Ltd.*, 450 F.Supp. 447 (W.D.Wash.1978). *See also, Polar Shipping, Ltd. v. Oriental Shipping Corp.*, 680 F.2d 627 (9th Cir. 1982), in which admiralty autonomy was again restated. This autonomy is grounded on the maritime context in which admiralty is set. The Supreme Court made this clear in the case of *Re Louisville Underwriters*, 134 U.S. 488, 493, 10 S.Ct. 587, 589, 33 L.Ed. 991 (1890) by stating:

Courts of admiralty are established for the settlement of disputes between persons engaged in commerce and navigation, who, on the one hand, may be absent from their homes for long periods of time, and, on the other hand, often have property or credits in other places. In all nations, as observed by an early writer, such courts 'have been directed to proceed at such times, and in such manner, as might best consist with the opportunities of trade, and least hinder or detain men from their employments.' (citation omitted) In the same spirit this court has more than once said: 'Courts of admiralty have been found necessary in all commercial countries, for the safety and convenience of commerce and the speedy

decision of controversies, where delay would often be ruin.' (Citations omitted). To compel suitors in admiralty (when the ship is abroad and cannot be reached by a libel in rem) to resort to the home of the defendant, and to prevent them from suing him in any district in which he might be served with a summons or his goods or credits attached, would not only often put them to great delay, inconvenience and expense, but would in many cases amount to a denial of justice.

The process of foreign attachment which plaintiff used in this case has been recognized to be of ancient origin and preceding the founding of this Republic. As stated in *Manro v. Almeida*, 23 U.S. (10 Wheat.) 206, 6 L.Ed. 369 (1825):

> Thus, this process has the clearest sanction in the practice of the civil law, and during the three years that the admiralty courts of these states were referred to the practice of the civil law for their "forms and modes of proceeding," there could have been no question that this process was legalized. Nor is there anything in the different phraseology adopted in the act of 1792, that could preclude its use. That it is agreeable to the "principles, rules and usages, which belong to courts of admiralty," is established, not only by its being resorted to in one at least of the courts of the United States, but by the explicit declaration of a book of respectable authority, and remote origin, in which it is laid down thus: "If the defendant has concealed himself, or has absconded from the kingdom, so that he cannot be arrested, if he have [*sic*] any goods, merchandise, ship or vessel, on the sea, or within the ebb or flow of the sea, and within the jurisdiction of the Lord High Admiral, a warrant is to be impetrated to this effect, viz., to attach such goods or ship of D., the defendant, in whose hands soever they may be; and to cite the said D. specially as the owner, and all others who claim any right to title to them, to be and appear on a certain day to answer unto P., in a civil and maritime cause".

The process of foreign attachment, developed to meet the necessities of those engaged in the multiple aspects of maritime commerce has two purposes as established in *Swift & Co. v. Compañia Colombiana*, 339 U.S. 684, 70 S.Ct. 861, 94 L.Ed. 1206 (1949): (1) to secure the appearance of the respondents and (2) to secure satisfaction in case the suit is successful. *See also San Rafael Compañia Naviera, S.A. v. American Smelting & Refining Co.*, 327 F.2d 581, 589 (9th Cir.1964). It should be noted that foreign attachment was originally found in Rule 2 of the former Rules of Admiralty which, after the unification of those rules with the F.R.C.P. in 1966, became Supplemental Rule B.

■ Apex's first challenge is based upon the due process clause as it restricts the assertion of personal jurisdiction through proceedings by attachment. Maritime attachment is part of admiralty jurisdiction in the maritime context. Since the constitutional power of the federal courts is separately derived from admiralty, suits under admiralty jurisdiction involve separate policies to a certain extent. This principle suggests, not only that jurisdiction by attachment of property should be accorded special deference in the admiralty context, but also that maritime actors must reasonably expect to be sued where their property may be found. *See Amoco Overseas Oil v. Compagnie Nationale Algenienne, supra*, 605 F.2d at 655. Thus, the history of maritime attachment itself, the autonomy of admiralty jurisprudence, the long constitutional viability of maritime attachment, and the modern trend in admiralty to strengthen traditional admiralty remedies against property, rather than to erode them, compel the conclusion that the common law principles enunciated in *Shaffer v. Heitner, supra*, do not apply to Rule B(1) attachments. The unique basis for admiralty jurisdiction supports the constitutionality of the attachment provided by Rule B.

■ Defendant's second challenge is based on the due process clause claiming that it results in the deprivation of property without prior notice and hearing. Once

again, consideration must be given to the rationale for Supplemental Rule B to determine the validity of this argument. We turn again to the case of *Polar Shipping* since we think it will be presumptuous on our part to try to improve what was said therein. The court stated at page 637:

> As we have seen, there are two reasons for the procedure authorized in Supplemental Rule B: to assure a respondent's appearance, and to assure satisfaction in the case the suit is successful. ... Both are of great importance in admiralty and maritime cases. Maritime law deals primarily with ships that sail the seven seas. A ship may be here today and gone tomorrow, not to return for an indefinite period, perhaps never. Assets of its owner, including debts for freights, as in this case, within the jurisdiction today, may be transferred elsewhere or paid off tomorrow. It is for these reasons that maritime actions *in rem*, libelling a ship or other assets of a defendant, Supplemental Rule C, or attachment in actions *in personam*, Supplemental Rule B, were developed. These reasons are as valid today as they ever were. Particularly in the case of debts and credits, such as the debt for freight that was attached in this case, they are necessary and valid today. In this electronic age, freights owing to a charterer, such as Sanko, can be transferred instanter, by electronic order, from, say Honolulu, to, say, a numbered bank account in a bank in Switzerland or some other non-maritime haven. The need to attach now and notify later is as great now as it ever was, if not greater. A ship can quietly slip its moorings and depart the jurisdiction. It can easily take with it such tangible property as may be within the jurisdiction. And credits can be quickly transferred elsewhere. These considerations, too, militate in favor of the validity of Supplemental Rule B.

Supplemental Rule B was under attack in *Polar* because, *inter alia*, no notice to the defendant is required before the attachment is levied. The court rejected that contention ruling that due process does not require pre-attachment notice.

Property attached under Supplemental Rule B could be shipped out, otherwise disposed of, or concealed; credits, such as the one involved here, could be collected or quickly transferred from the jurisdiction. Notice prior to attachment would in many instances enable the owner to frustrate judicial enforcement of the lien. In fact, it could defeat the purposes of the attachment.

The court in *Polar, supra,* after due consideration of *Sniadach* and its progeny concluded that those decisions do not require holding Supplemental Rule B invalid because it does not provide for pre-attachment notice and hearing. It reasoned that so to hold would negate the "reasons why the 'old process' now embodied in the rule was developed and is still needed". *See also Mitchell v. W.T. Grant Co.,* 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974), where petitioner asserted that his right to a hearing before his property was in any way disturbed was mandated by the holdings in the cases culminating in *Sniadach;* and *Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). Contrary to the assertion of the petitioner to the effect that the pre-*Sniadach* cases required an opportunity to be heard prior to any actual deprivation of private property, the *Mitchell* court held 416 U.S. at page 611, 94 S.Ct. at page 1902 that those cases "merely stand for the proposition that a hearing must be had before one is finally deprived of his property and do not deal at all with the need for a pretermination hearing where a full and immediate post-termination hearing is provided". The court added that the rule has been that mere postponement of the judicial inquiry is not a denial of due process, if the opportunity given for ultimate judicial determination of liability is adequate.

Rule B does not provide for the final deprivation of defendant's property. It has, as already noted, the purpose of securing the appearance of the respondents and to insure satisfaction in the event that the

suit is indeed successful. · Thus, mere postponement of judicial inquiry for determination of liability during trial is not a denial of due process.

■ Defendant also contends that the procedure prescribed by Rule B(1) is insufficient to protect it from a mistaken deprivation of property for the following reasons: (1) the writ was issued by the clerk upon a complaint and an affidavit that defendant could not be found within the district; (2) the writ was issued by the clerk as a matter of course without judicial participation; (3) there is no provision for an immediate post-seizure hearing in the district; (4) Rule B does not require the posting of a pre-garnishment bond by plaintiff.

Rule B requires a verified complaint and an accompanying affidavit stating that defendant cannot be found within the district. This procedure was held sufficient in *Polar, supra,* the court holding that the affidavit can be by the plaintiff or his attorney, and upon information and belief.

In *Merchants Nat. Bank v. Dredge Gen. G.L. Gillespie,* 663 F.2d 1338 (5th Cir.1981), *cert. denied,* 456 U.S. 966, 102 S.Ct. 2263, 72 L.Ed.2d 865 (1982), the court dealt with the issue of the constitutionality of Admiralty Rules C and E. The claimants argued, *inter alia,* that the Admiralty Rules are constitutionally deficient because they do not provide for the participation by a judge or a magistrate prior to seizure. The court found that the argument falters at two crucial points and concluded at page 1344:

> First, the inherent risks of deterioration, attachment of additional liens, destruction, alienation, and conveyance to third parties which are present in the maritime context require that a vessel be subject to immediate seizure to be held in custody to protect and enforce a valid maritime lien. Seizure of a vessel pursuant to a valid lien has been necessary for centuries due to the wandering nature of a ship in commerce. Second, it is questionable whether a judge or magistrate on a pre-arrest basis could fairly consider complicated transactions bearing on the

ultimate enforcement of the asserted maritime lien. A denial of the seizure might effectively dispose of the claim on the merits without trial. The *lienor* would then be denied due process under the Fifth Amendment.

> Beginning, then, with the Admiralty rules themselves, we find it clear that the seizure provisions preserve both the rights of the respective parties and the necessities of maritime commerce.

The court in *Polar* was also faced with an attack to the constitutionality of Rule B of the Supplemental Rules on the grounds that the procedure contemplated therein did not provide for the intervention of a judge or magistrate at the inception of the proceedings but the court reasoned that "[*to*] require that a judge, rather than the clerk, scrutinize these arguments, *ex parte,* would add little protection, if any, to the defendants, probably none. The probable product of such a ruling would be more legal boiler plate".

Although Supplemental Rule B does not expressly provide for an immediate post-seizure hearing, the rule must be read in conjunction with Rule 12 of the Federal Rules of Civil Procedure, which by the terms of Rule 1 and Supplemental Rule A, is made applicable to suits in admiralty. Rule 12(b) provides that any defense, objection, or request which may be subject of determination without the need for trial on the general issues, may be raised before trial by motion. Thus, Rule 12(b) accommodates a challenge to the jurisdiction of the court over the person and, consequently, to the validity of the attachment. Supplemental Rule B should also be read in conjunction with Rule 25 of the Local Rules of our Court, which provides for the release of seizures, by paying into court the amount alloted to be due or by filing an approved stipulation for such amount; with Supplemental Rule E(5) which provides that the attachment may be stayed or the property released by the giving of security or the filing of a stipulation; with Rule E(7) which provides that plaintiff must post security for a counterclaim if the defendant

has posted security for plaintiff's claim. It should also be noted that Supplemental Rule E(2)(b) and Rule 5 of the Local Rules provide for the posting of a bond by plaintiff to secure the costs, expenses and attorney's fees which may be awarded in the event of a mistaken deprivation of property.

Considering all the above, we hold that the maritime attachment procedure provided by Supplemental Rule B(1) does not violate the Fifth Amendment.

### III

We turn now, although briefly, to defendant's request that we dismiss the first, second and sixth claims for relief pleaded by plaintiff. Defendant contends that we lack jurisdiction to entertain those claims since they are not cognizable maritime claims. Those claims for relief are asserted to collect demurrage charges allegedly owed by defendant. This court has already determined that demurrage charges are considered admiralty and maritime claims within the jurisdiction of the federal district courts. *See Gulf Puerto Rico Lines v. Associated Food Co., Inc.,* 366 F.Supp. 631, 635 (1973); *Pennsylvania Railroad Co. v. Moore-McCormack Lines,* 370 F.2d 430 (2nd Cir.1966); *Hellenic Lines Ltd. v. Director General of India Supply Mission,* 319 F.Supp. 821 (S.D.N.Y.1970), *aff'd,* 452 F.2d 810 (2nd Cir.1971).

### IV

As far as we know, the issues decided in Part II of this Opinion are of first impression both in this district and in our Circuit, and since we are not unmindful of the fact that there are strong authorities against each of the positions we have adopted regarding those issues, we will be inclined to certify this matter to the United States Court of Appeals for the First Circuit, if so requested by defendant.

WHEREFORE, in view of the foregoing, defendant's request to vacate process of maritime attachment and garnishment and motion to dismiss is denied.

SO ORDERED.